UNITED STATES DISTRICT COURT
DISTRICT OF MAINE

| | |
|---|---|
| JASON SPOONER, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) Docket No. 08-cv-262-P-S |
| | ) |
| EEN, INC., et al., | ) |
| | ) |
| Defendants. | ) |

**FINDINGS OF FACT & CONCLUSIONS OF LAW**

The Court held a bench trial in this matter on January 12, 2010. The parties each filed Proposed Findings of Fact and Conclusions of Law on February 5, 2010 (Docket #s 108 & 109) and memoranda of law on February 10, 2010 (Docket #s 110-115). The Court also received supplemental memoranda from the parties (Docket #s 116 & 117). The bench trial transcript was filed on April 28, 2010 (Docket # 118). In accordance with Federal Rule of Civil Procedure 52(a) and having reviewed the parties' post-trial submissions as well as the entire record, the Court now makes the following findings of fact and conclusions of law:

**I.    FINDINGS OF FACT**

   **A. The Parties**

   1. Defendant EEN, Inc. ("EEN") is a New Hampshire corporation that was incorporated on February 5, 2007, and operates as a media and video production service provider. EEN was formed as a successor entity of Egan Entertainment Network, Inc. ("Egan Entertainment"), which was administratively dissolved in 2007.

   2. Defendant Dan Egan ("Egan") is the president and controlling shareholder of EEN. Egan also served as president and treasurer of Egan Entertainment. In these roles, Egan had

1

the right and ability to supervise all of the operations of EEN and Egan Entertainment. He has also owned 90 percent of the stock of both Egan Entertainment and EEN.

3. In addition to Dan Egan, Egan Entertainment and EEN each employed one or two people in the role of producer. Carter Davidson worked as one of those producers until September 2007. Jason Buiel began working as a producer for EEN after Davidson departed.

4. If EEN is liable on any of the claims asserted here, Dan Egan is personally liable.

5. Egan, an accomplished adventure skier, has been in the media production business for approximately twenty years, and during that time his work has been nominated for three regional Emmy awards.

6. Egan has produced movies, television shows and hundreds of commercials. Egan, through his companies, EEN and Egan Entertainment, has syndicated shows to over 70 million homes. Given this body of work, Egan has copyrighted multiple films and books produced through his media businesses.

7. Plaintiff Jason Spooner ("Spooner") is a singer and songwriter and has worked in that capacity for approximately fifteen years. In 2003, he registered his first album, "Lost Houses" with the United States Copyright Office.

8. Jason Spooner is the exclusive owner of the copyright in and to the musical composition and sound recording of "Who I Am," an original song on the "Lost Houses" album. Upon his filing of the copyright registration with the requisite deposit, Spooner received a Certificate of Registration, No. SR0000331370, dated March 17, 2003.

9. Spooner primarily earns a living by working as a graphic designer. His 2006 federal tax return indicates that he made $836 from music. Spooner's 2007 federal tax return

indicated that he lost about $35,000 from his music. In 2008, Spooner reported making approximately $58,000 from royalties and music on his federal tax return.[1] In the first three quarters of 2009, Spooner made approximately $2,000 in royalty income.

**B. The Spooner License**

10. In February 2005, Carter Davidson, then a producer for Egan Entertainment, was responsible for contacting Spooner and obtaining a license to use Spooner's music.

11. There were no written agreements between Jason Spooner and Egan Entertainment, only the oral agreements reached between Davidson, acting on behalf of Egan Entertainment, and Spooner.

12. The scope of the license that Spooner gave Egan Entertainment in early 2005 only allowed for the use of Spooner's music in Must Ski TV.

13. Davidson contacted Spooner again in May 2005 asking to expand the scope of the license so that he could use Spooner's music in a new Wild World television series. Spooner granted a limited license for use in the new Wild World television series in May 2005.

14. Davidson understood that the oral license he negotiated with Spooner was limited to Must Ski TV and Wild World.

15. Spooner never granted any license specifically to EEN, an entity that did not exist in 2005.

16. Spooner did not and would not have given Egan Entertainment a license to use his songs in a for-profit commercial.

17. Dan Egan assumed that Davidson obtained an unlimited license from Spooner that allowed Egan Entertainment or EEN to use Spooner's music in any Egan Entertainment

---

[1] This amount included $22,632 received from Sugarloaf in accordance the settlement achieved after Sugarloaf's offer of judgment.

or EEN production. Egan never communicated with Spooner directly regarding the scope of the license at any time prior to 2008.

C. **EEN/Egan Entertainment Business Practices**

18. EEN only occasionally pays for music licenses and has no music budget.

19. Egan Entertainment had no record keeping policies. There was no place to store information or notes related to licenses that were procured.

20. EEN has no manuals or written policies related to copyright issues or procedures for obtaining licensing agreements.

21. Dan Egan has orally instructed employees of EEN: "Don't use music that we don't have rights to." (Pl. Ex. 45 at 33.)

22. The general practice of Egan Entertainment and EEN was to secure oral licenses for music and promise to give the musician credit in the production when possible in exchange for the license.

23. Once an oral license from the musician was secured, the music would be added to the Egan Entertainment/EEN electronic music library.

24. EEN does not maintain any records by which it tracks what music has been used from its electronic music library in various productions.

25. Dan Egan assumed that EEN had unlimited license to use music maintained in the Egan Entertainment/EEN music library unless one of his producers (Carter Davidson or Jason Buiel) communicated to him that the artist had limited the scope of the license. Davidson never communicated his own understanding of the limited nature of the Spooner license to Egan.

26. On one occasion while Davidson worked for Egan Entertainment, Egan instructed Davidson that he could not use a song which Egan knew the company did not have a license to use.

27. EEN and Egan copyright their own productions and have had occasion to enter into licensing agreements regarding their work (See, e.g., Ex. 23 & 31.)

28. Given this experience with copyrighting their own work and their other experience as a media production company and service producer, both EEN and Egan knew that a proper license was needed prior to utilizing copyrighted sound recordings or musical compositions in any commercial production.

**D. The Sugarloaf "Who I Am" Commercial**

29. In late 2007, EEN produced an approximately one-minute television commercial that featured a portion of the sound recording of Spooner's song "Who I Am." The commercial was produced for and sold to Sugarloaf Mountain Corporation/Boyne USA, Inc. (hereinafter, "Sugarloaf").

30. On December 26, 2007, EEN billed Sugarloaf $5,875.00 for production of the commercial.

31. The song "Who I Am" was chosen for the commercial by Frank Guerriero, Sugarloaf's acting director of marketing. Guerriero choose that song out of a set of tracks that EEN played for Guerriero.

32. EEN assured Sugarloaf (and Guerriero, in particular) that it had the rights to use "Who I Am" in the commercial.

33. Although Jason Bueil, the producer for EEN, sometimes checked with artists to ensure EEN had the license to use their music in a production before the finished product was

sent out, he did not check with Jason Spooner prior to sending out the Sugarloaf commercial.

34. Given the experience possessed by EEN and Dan Egan, Defendants were well aware of the need to have an appropriate license before using "Who I Am" in a commercial.

35. Defendants did not have a license or permission that allowed them to sell the Sugarloaf commercial containing Spooner's sound recording of "Who I Am."

36. EEN provided the commercial to Sugarloaf in a variety of formats so that they could easily "get the spot out to whomever" and distribute it however they wanted. In short, EEN distributed the commercial to Sugarloaf only and Sugarloaf then controlled further distribution of the commercial.

37. In March 2008, the Sugarloaf commercial aired on television broadcasts to local Maine markets in Cumberland, York and Penobscot counties.

38. Sugarloaf also posted the commercial on YouTube.

**E. Discovery and Notification of Infringement**

39. During the first week of March 2008, a co-worker told Spooner that he had heard a Spooner song during a television commercial. The co-worker then sent Spooner a link to the commercial on YouTube.

40. Upon discovering the infringing commercial on the internet, Spooner was shocked and took immediate action.

41. First, he called Sugarloaf and spoke with Guerriero. He also contacted EEN.

42. In a March 7, 2008 email to Spooner, EEN Producer Jonathan Buiel apologized for the use of Spooner's music and asked whether he should remove Spooner's music from EEN's library in an effort to prevent misuse in the future.

6

43. Despite Spooner's efforts to inform Sugarloaf and EEN of the unauthorized use of "Who I Am," the commercial continued to air through March 23, 2008.

44. Additionally, the commercial remained posted on YouTube until EEN contacted Sugarloaf and asked that it be taken down in accordance with Spooner's request.

45. In an email exchange on April 22, 2008, Spooner requested EEN provide him information regarding the airing of the infringing Sugarloaf commercial so that he could provide the information to his performing rights organization (SESAC). In response, Buiel provided some information and indicated that the remainder of information would need to come from Frank Guerriero at Sugarloaf. Buiel again offered to remove Spooner's music from EEN's library but Spooner's short reply email did not respond to this offer.

46. Although Spooner was scheduled to meet with Guerriero regarding the commercial in April 2008, Guerriero cancelled that meeting leaving Spooner frustrated.

47. Upon learning of the use of his music in the Sugarloaf commercial, Spooner requested information as to any other productions in which Defendants used his music. Defendants did not provide that information to Spooner until he obtained counsel.

48. Spooner initially named Sugarloaf Mountain Corporation/Boyne USA, Inc. as a defendant in this copyright infringement action. In October 2008, Spooner accepted Sugarloaf's offer of judgment in the amount of $30,000. Thereafter, a stipulation of dismissal (Docket # 25) was entered on the docket as to Sugarloaf Mountain Corporation and Boyne USA, Inc.[2]

---

[2] Because the parties elected to proceed via a voluntary dismissal in accordance with Federal Rule of Civil Procedure 41(a)(1)(ii), the Offer of Judgment was never actually consummated with an actual judgment, stipulated or otherwise, against Sugarloaf.

49. This case marks the first time Defendants have been sued for copyright infringement. However, Defendants settled a prior claim for copyright infringement with the Bruce Marshal Band around the time that the Sugarloaf commercial was being produced and sold.

## II. CONCLUSIONS OF LAW

1. This Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 1331 & 1338(2) because it alleges copyright infringement of a sound recording (Count I) and a musical composition (Count II).

2. The license obtained from Spooner in 2005 was limited to the use of his music in Must Ski TV and Wild World. Thus, Defendants did not possess a license that allowed them to use Spooner's sound recording of "Who I Am" in a commercial.[3]

3. Plaintiff has proven by a preponderance of the evidence that the production and sale of the Sugarloaf "Who I Am" commercial violated his rights as the copyright holder of the sound recording of "Who I Am". Plaintiff is entitled to judgment in his favor on Count I.

4. Given the facts of this case, including the fact that a single copyright holder holds the rights to both the sound recording and the musical composition of "Who I Am," the Court deems the musical composition and sound recording "one work" for purpose of statutory damages. Plaintiff is not entitled to a separate judgment in his favor on Count II.

---

[3] Because the Court finds that the license between Spooner and Egan Entertainment did not allow the song in question to be used in any commercial, the Court need not address the secondary legal question as to whether Egan Entertainment transferred a valid license to EEN (or even could have done such a transfer). Rather, for purpose of this decision, the Court assumes that the Spooner license was transferable to EEN upon the dissolution of Egan Entertainment in 2007. Similarly, the Court need not address the Plaintiff's argument that Defendants waived any defense with respect to license by failing to include the affirmative defense of license in their Amended Answer. (See Pl. Proposed Findings & Conclusions (Docket # 108) at 20; Defs. Post Trial Brief (Docket # 115) at 2 n.2.)

5. Neither Egan nor EEN have sustained the burden of proving they were not aware and had no reason to believe that their acts constituted an infringement of copyright. The record clearly shows, however, that Sugarloaf was not aware and had no reason to believe that its initial airing of the commercial on television and the internet constituted an infringement of Plaintiff's copyright.

6. Plaintiff has elected to pursue an award of statutory damages rather than "actual damages and profits," as is allowed under 17 U.S.C. § 504(c)(1). Under. § 504(c), the range of statutory damages for copyright infringement is at least $750 but not more than $30,000 "as the court considers just." 17 U.S.C.§ 504(c)(1). The Court "may increase the award of statutory damages to a sum of not more than $150,000" when the copyright owner proves the infringement was willful. 17 U.S.C. § 504(c)(2).

7. Defendants knew or should have known that their 2007 use of "Who I Am" sound recording in a commercial without any credit to Spooner far exceeded any 2005 license that had been obtained from Spooner for use of that sound recording. At the very least, Defendants acted in reckless disregard of the overwhelming likelihood that they were infringing on Plaintiff's copyright by selling the Sugarloaf commercial. Thus, the Court finds that Defendants' infringement was willful.

8. In accordance with 17 U.S.C. § 502, the Court will award Plaintiff permanent injunctive relief.

9. In accordance with 17 U.S.C. § 505, the Court will exercise its discretion to award Plaintiff a reasonable attorney's fee.

## III. DISCUSSION

In this case the evidence as to Defendants' liability for copyright infringement is clear and does not warrant further discussion. However, the calculation of damages is complex and warrants significant discussion. In its Order Following Bench Trial (Docket # 107), the Court highlighted many of the hard (albeit interesting) questions to be answered in assessing Plaintiff's statutory damages. In the discussion that follows, the Court attempts to answer those questions and assess statutory damages accordingly.

### A. The Number of Infringed "Works"

"[S]tatutory damages are to be calculated according to the number of works infringed." Walt Disney Co. v. Powell, 897 F.2d 565, 569 (D.C. Cir. 1990). Although "[t]he term 'work' is undefined under the Copyright Act," 17 U.S.C. § 102 lists musical compositions and sound records as separate works. Gamma Audio & Video, Inc. v. Ean-Chea, 11 F.3d 1106, 1116 (1st Cir. 1993); see 17 U.S.C. § 102(a)(2)&(7). Likewise, the publications of the United States Copyright Office are clear that they consider musical compositions and sound recordings "separate works" for purposes of registration. See Circular 56A (Docket # 112-1) (noting that although they are separate works, "a musical composition and a sound recording may be registered together on a single application if ownership of the copyrights in both is exactly the same"). Additionally, multiple cases have recognized that musical compositions and sound recordings are "separate works with their own distinct copyrights." E.g., Newton v. Diamond, 204 F. Supp. 2d 1244, 1248-49 (C.D. Cal. 2002).

However, in the context of awarding statutory damages, courts have declared that "separate copyrights are not distinct works unless they can 'live their own copyright life.'" Walt Disney, 897 F.2d at 569 (quoting Robert Stigwood Group, Ltd. v. O'Reilly, 530 F.2d 1096, 1105

(2d Cir. 1976)); accord Gamma, 11 F.3d 1117 n. 8 ("[T]he number of copyright registrations is not the unit of reference for determining the number of awards of statutory damages.") In determining whether a work lives its own copyright life, the salient question is "whether each expression has an independent economic value and is, in itself, viable." MCA Television, 89 F.3d at 769; accord Gamma, 11 F.3d at 1116-17. As explained in Nimmer on Copyright: "[T]o qualify for a separate minimum award, the work that is the subject of a separate copyright would have to be in itself musically, dramatically, or otherwise viable, even if not presented in conjunction with the other work in which it is incorporated." Nimmer on Copyright § 14.04[E][1] at 14-93 (footnotes omitted); see also, e.g., Walt Disney, 897 F.2d at 569-70 (copying of six different poses of Mickey Mouse and Minnie Mouse held to be infringement of only two works, *i.e.,* one each of Mickey and Minnie, even though six images were separately copyrighted); Robert Stigwood Group, 530 F.2d at 1104-05 (copying of music, libretto, and vocal score of a rock opera held to constitute one infringement, even though each was copyrighted separately).

In the Court's view, this "own copyright life" test can and should consider the context of the infringement, which, in this case, involves a producer solely interested in sound recordings. There is no evidence that Defendants have any use for or interest in musical compositions. They are not musicians and there is no evidence that they have ever attempted to license a musical composition so that it could be performed in accordance with 17 U.S.C. §§ 114(a) &106(4). Defendants are solely in the market for sound recordings that they then use as background music for their film productions. Each sound recording necessarily encompasses a musical composition (which may or may not be copyrighted). In this context, Plaintiff's musical composition had no independent economic value to Defendants and is simply incorporated into

the value of the sound recording.[4]  Under this factual scenario, the Court believes there is "one work" for purposes of 17 U.S.C. § 504(c)(1).[5]  See ASA Music Productions v. Thomsun Electronics, No. 96 Civ. 1872(BDP)(MDF), 1998 WL 988195  (S.D.N.Y.Sept. 29, 1998) ("[T]he infringement that took place is best perceived as having constituted an infringement of one work. The song, arrangement, and performance together comprise a work that is conceptually indivisible.")

In arguing that he is entitled to two statutory damage awards because the Sugarloaf commercial simultaneously infringed on the "Who I Am" sound recording and musical composition, Plaintiff has acknowledged that this case is "unusual" and presents an issue of "first impression" for the courts of this district.  (See Pls. Mem. #3 (Docket # 112) at 3.)  Notably, Plaintiff has been unable to point the Court to any case in which a single plaintiff has received the type of doubled statutory award for a sound recording infringement that he now seeks. Starting with the premise that almost every sound recording involves at least one underlying musical composition, Plaintiff's argument would create a rule whereby a single copyright holder who writes a song and then creates a sound recording would be entitled to double statutory damages if his sound recording is used but only one set of statutory damages if his musical composition is used.  In the situation presented here in which the same person holds the

---

[4] While the Court by no means suggests that Spooner cannot separately license his "Who I Am" musical composition, the Court notes that the record is devoid of any evidence that the musical composition has ever been separately licensed and has had independent value outside of Spooner's own performance of the song.

[5] In so holding, the Court does not suggest that the outcome would necessarily be the same if there were separate copyright holders for the sound recording and musical composition at issue.  See, e.g., Teevee Toons, Inc. v. MP3.com, Inc., 134 F. Supp. 2d 546, 548 (S.D.N.Y. 2001) ("[T]he repeated use of the singular 'copyright owner' in 17 U.S.C. § 504(c) makes clear that the mandate to consider 'all the parts of a ... derivative work [as] one work' assumed a single owner of all parts of the derivative work, and the legislative history, while somewhat obscure, at least confirms that Congress simply meant to preclude an author from recovering multiple statutory damages for infringements of several different versions of a single work.")

copyright to both the sound recording and musical composition at issue, this type of "per work" doubling of damages seems illogical.

In reaching this conclusion, the Court has reviewed a number of notable cases discussing "works" in the context of television episodes. See, e.g., MCA Television Ltd. v. Fetner, 89 F.3d 766 (11th Cir. 1996); Gamma Audio & Video, Inc. v. Ean-Chea, 11 F.3d 1106, 1116 (1st Cir. 1993); Twin Peaks Productions, Inc. v. Publications Intern., Ltd., 996 F.2d 1366 (2d Cir. 1993). Arguably, the recording of a television episode is analogous to a sound recording in that each could incorporate a separately copyrighted underlying script or composition. While MCA Television, Gamma Audio, and Twin Peaks discuss and focus on the issue of whether each episode is a series can be a separate work, the cases do not contain any suggestion that an infringement of a single episode is actually entitled to a double statutory award, one for the written script and one for recorded performance of the script. See, e.g., MCA Television, 89 F.3d at 768-70 (statutory damages awards for 900 works because infringer aired 900 separate episodes); Gamma Audio, 11 F.3d at 1116; Twin Peaks, 996 F.2d at 1380-81 (finding there were eight separately written and copyrighted television scripts that had been infringed by book publication). The absence of any suggestion of double statutory damages for a single episode in these cases informs the Court's conclusion here.

In short, the Court concludes that the Defendant's infringement of the "Who I Am" sound recordings involved overlapping copyrights but infringed on only one work for purposes of statutory damages under 17 U.S.C. § 504(c)(1).[6] Based on this conclusion, the Court will enter judgment in favor of Defendants on Count II and make one award of statutory damages.

---

[6] See WB Music Corp v. RTV Communication Group, Inc., 445 F.3d 538, 541 n.4 (2d Cir. 2006) (noting that the ongoing vitality of the "overlapping copyrights doctrine" is an open question).

**B. Willfulness**

In this case, EEN operated in reckless disregard of Spooner's copyright. While there is evidence that Defendants have entered into clear written licensing agreements with respect to the use of their own copyrighted works, Defendants generally only obtain oral licenses when using the copyrighted work of others. Based on these oral licenses, songs are added to a music library. EEN maintained no system for tracking the scope of these licenses, including any license that might be limited. Rather, Defendants simply assumed they had unlimited licenses to every song added to the EEN electronic music library. In short, Defendants hid their heads in the sand when it came to any limitation on their ability to use music once it was added to the library based on an oral license. Video Views, Inc. v. Studio 21, Ltd., 925 F.2d 1010, 1021 (7th Cir. 1991) ("[O]ne who undertakes a course of infringing conduct may neither sneer in the face of the copyright owner nor hide its head in the sand like an ostrich."), overruled on other grounds, Fogerty v. Fantasy, Inc., 510 U.S. 517 (1994).

In finding that the Sugarloaf commercial involved a willful infringement, the Court also notes that the use of Spooner's music in the Sugarloaf commercial did not involve Spooner receiving any credit as per the oral licensing agreement. In the Court's view, this lack of credit further reflects Defendants' intent to operate in total disregard of any licensing agreement they may previously have had with Spooner.

**C. Damages**

"An award of statutory damages serves two purposes: it compensates the plaintiff for the infringement of its copyrights, and it punishes the defendant for their unlawful conduct." Universal City Studios Productions LLLP v. Bigwood, 441 F. Supp. 2d 185, 191 (D. Me. 2006). In exercising its discretion to award damages somewhere between $750 and $150,000, the Court

considers a number of factors. See, e.g., Bryant v. Media Right Productions, Inc., --- F.3d ---, 2010 WL 1659133 at *6 (listing six factors to be considered) (2d Cir. April 27, 2010).

First and foremost, the "key factor" to be considered is Defendants' intent. National Football League v. PrimeTime 24 Joint Venture, 131 F. Supp. 2d 458, 474 (S.D.N.Y. 2001). In this respect, the Court gives due weight to its conclusion that Defendants' infringement was willful. This level of intent supports a potential increase in the statutory damages to be awarded. See, e.g., Venegas-Hernandez v. Sonolux Records, 370 F.3d 183, 196 (1st Cir. 2004) ("A decision in an infringement suit to increase the statutory rate based on a finding of willfulness, like an upward departure from a sentencing guideline's range, is a punitive measure meant to deter.")

The Court also takes into account the experience and knowledge of Defendants with respect to copyright practices and the need for licenses. While Defendants are a small operation, they have many years of experience and a significant body of work. If Defendants were relatively new to the business of production and its related licensing requirements, Defendants' conduct might be more understandable. However, in considering Egan's experience, his conduct that led to this case is inexplicable.

The Court also considers Defendants' less-than-prompt reaction upon being notified by Plaintiff that they had sold a commercial that clearly infringed on his copyright. Egan's lackadaisical attitude toward the infringement at issue in this case was also reflected during the course of this litigation and included a failure to comply with his discovery obligations. (See August 19, 2009 Order (Docket # 79) & July 21, 2009 Recommended Decision (Docket # 69).) Given this behavior, the Court believes an increased award is necessary to deter future

infringement by Defendants. Absent an award that sends a message, it seems likely that Defendants will fail to adopt proper business practices to prevent future infringements.

Finally, the case law instructs that the Court should consider the expenses saved and profits reaped by Defendants in connection with the infringement. As noted in the facts, Defendants invoiced less than $6,000 for the making of the infringing commercial. The Court generally may also consider the revenues lost by a copyright holder as a result of the infringement. However, in the context of this case in which Plaintiff credibly testified that he would not license his music for use in commercials, this factor has little utility.

Having considered all of the factors just listed in the context of the entire record, the Court hereby awards statutory damages of $40,000.00.

### D. Impact of Sugarloaf Settlement

Section 504(c)(1) clearly calls for joint and several liability on statutory damages "for all infringements involved in the action." 17 U.S.C. § 504(c)(1) As explained in Robles Aponter v. Seventh Day Adventist Church Interamerican Div., 443 F. Supp. 2d 228 (D.P.R. 2006): "If various defendants partake in an event or series of events which violate rights protected by the Copyright Act they will be held jointly and severally liable to plaintiff." Id. at 231; see also Branch v. Ogilvy & Mather, Inc., 772 F. Supp. 1359, 1364 (S.D.N.Y. 1991). The infringements involved in this action include the airing of the Sugarloaf commercial and Plaintiff has asked the Court to make findings of fact regarding the commercial's distribution by Sugarloaf. Nonetheless, to the extent that Sugarloaf was responsible for the television broadcasts and YouTube posting, it chose to settle with Plaintiff and all claims against this defendant (hereinafter, the "Settling Defendants") were subject to voluntary dismissal.

The Court has struggled with the correct manner for calculating damages against the remaining Defendants in light of this settlement and the joint and several liability for statutory damages. At the close of trial, the Court specifically asked the parties to brief the question of how any damage award entered should be reconciled with the Plaintiff's acceptance of the $30,000 from Sugarloaf in October 2008.

In response to the Court's questions, Plaintiff's Memorandum argues the Settling Defendants and the remaining Defendants "were involved in separate infringements and did not create a single indivisible injury." (Pl.'s Mem #4 (Docket # 113) at 1.) In support of this argument, Plaintiff alternatively relies on common law principles and cases that pre-date the 1976 Copyright Act. (Id. at 1-3.) In the Court's view, the cases cited by Plaintiff are inapplicable in light of the clear language of § 504(c)(1), which calls for a plaintiff who elects statutory damages to receive one joint and several damage award "for all infringements involved in the action." 17 U.S.C.§ 504(c)(1). To the extent Plaintiff invites the Court to consider the sale and subsequent publication of the Sugarloaf commercial as separate infringements for purposes of assessing statutory damages, the Court declines to do so.[7] Not surprisingly, Defendants urge the Court to find the Settling Defendants jointly and severally liable with the remaining Defendants and, therefore, deduct the full value of any settlement from any damage award to be paid by Egan and EEN. On this issue, Defendants have the better argument.

Two circuit courts have had occasion to address this issue; both have applied a "one satisfaction rule" and reduced damages to be paid by the remaining defendants dollar-for-dollar.

---

[7] Plaintiff's Second Amended Complaint (Docket # 48), which was filed after the Sugarloaf settlement, explicitly recasts the case to exclude Sugarloaf's infringements. However, the Court does not believe that the mere filing of this Amended Complaint allows Plaintiffs to sidestep the joint and several liability of 17 U.S.C. 504(c)(1) for all infringements that were "involved in this action" at the time of the initial filing.

See BUC Int'l Corp. v. International Yacht Council Ltd., 517 F.3d 1271, 1278 (11th Cir. 2008)("The one-satisfaction rule, by contrast, operates to prevent double recovery, or the overcompensation of a plaintiff for a single injury."); Screen Gems-Columbia Music, Inc. v. Metlis & Lebow Corp., 453 F.2d 552, 553-54 (2d Cir.1972). Given the opportunity to brief the question, neither Plaintiffs nor Defendants have provided the Court with any basis for ignoring these precedents. Thus, the Court finds the Settling Defendants are jointly and severally liable with Egan and EEN for the damages awarded up to $30,000. Thus, after the one satisfaction rule is applied, judgment shall enter against Defendants EEN and Egan for $10,000.

Notably, even absent the settlement, Defendants Egan and EEN would be solely responsible for $10,000 in damages awarded pursuant to 17 U.S.C. § 504(c)(2). The record readily supports a finding that the Settling Defendants were, in fact, innocent infringers. Thus, any statutory damage award against them could not exceed $30,000 in accordance with § 504(c)(1).[8]

### E. Injunctive Relief

Plaintiff also seeks injunctive relief pursuant to 17 U.S.C. § 502. "Courts generally grant permanent injunctions where liability is clear and there is a continuing threat to the copyright." Bigwood, 441 F. Supp. 2d at 192. In this case, liability is clear but the only evidence of "continuing threat" is that EEN apparently still maintains Spooner's music in its electronic music library. By all accounts, the music remains in the library because Plaintiff has not clearly indicated that EEN should cease and desist in its use of his music. Given Plaintiff's request for injunctive relief and Defendants' desire to have clarity on this issue going forward, the Court will

---

[8] Notably, in Nimmer on Copyright, the authors posit: "[I]n the case of one willful and one innocent infringer, the court should award the maximum for non-willful infringement jointly and severally . . . and any additional amount solely against the willful infringer." Nimmer on Copyright §14.04[E][2][d] n. 354. In calculating the damages here, the Court has attempted to adopt this approach.

award a permanent injunction under which Defendants shall remove Spooner's music from the EEN electronic music library and shall not infringe on Spooner's copyrighted recordings in any future productions.

### F. Attorney's Fee

Under the Copyright Act, the Court may "award a reasonable attorney's fee to the prevailing party as part of the costs." 17 U.S.C. § 505. "The goal of such awards is to 'vindicat[e] the overriding purpose of the Copyright Act: to encourage the production of original literary, artistic, and musical expression for the public good.'" Mag Jewelry Co., Inc. v. Cherokee, Inc., 496 F.3d 108, 122 (1st Cir. 2007) (quoting Lotus Dev. Corp. v. Borland Int'l, Inc., 140 F.3d 70, 73 (1st Cir.1998)). In this case, the Court believes an award of attorney's fees furthers those goals. In considering whether to allow Plaintiff an award of attorney's fees, the Court has considered "'frivolousness, motivation, objective unreasonableness (both in the factual and in the legal components of the case) and the need . . . to advance considerations of compensation and deterrence.'" Fogerty, 510 U.S. at 534 n. 19 (quoting Lieb v. Topstone Industries, Inc., 788 F.2d 151, 156 (3rd Cir. 1986)); see also Garcia-Goyco v. Law Environmental Consultants, Inc., 428 F.3d 14, 20 (1st Cir. 2005) (endorsing this list of "Fogerty factors"). In short, all of those factors support an award of some amount of attorney's fees in this case. The Court will reserve ruling on the appropriate amount of the fee.[9]

---

[9] To the extent either party believes that the Court's application of joint and several liability and the "one satisfaction rule" impacts the amount of fees to be awarded, they should include that argument with supporting citation in their submissions on the motion for attorney's fee.

## IV. CONCLUSION

Based on the above findings and conclusions, the Court hereby ORDERS judgment be entered in favor of Plaintiff Jason Spooner on Count I with statutory damages of $10,000. Judgment shall enter in favor of Defendants on Count II.

In accordance with this order, Defendants Dan Egan and EEN shall be permanently ENJOINED from infringing on Jason Spooner's copyrighted recordings in any future productions. In order to comply with this permanent injunction, Defendants shall remove any and all sound recordings by Jason Spooner from the EEN electronic music library.

Plaintiff shall file a motion for attorney's fees in accordance with Federal Rule of Civil Procedure 54(d)(2) and District of Maine Local Rule 54.2.

SO ORDERED.

                                                /s/ George Z. Singal
                                                U.S. District Judge

Dated this 11th day of May, 2010.